**2014 UT App 270**

## THE UTAH COURT OF APPEALS

R.B.,
Petitioner and Appellant,
*v.*
L.B.,
Respondent and Appellee.

Opinion
No. 20130188-CA
Filed November 14, 2014

Third District Court, West Jordan Department
The Honorable Bruce C. Lubeck
No. 064401209

R.B., Appellant Pro Se

Steve S. Christensen and David M. Corbett,
Attorneys for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGE J.
FREDERIC VOROS JR. and SENIOR JUDGE JUDITH M. BILLINGS
concurred.[1]

PEARCE, Judge:

¶ 1    This case involves a child custody agreement made by
divorcing parents. The agreement contemplated that L.B.

---

1. The Honorable Judith M. Billings, Senior Judge, sat by special
assignment as authorized by law. *See generally* Utah R. Jud.
Admin. 11-201(6).

(Mother) would have custody of their minor son (Child) until he entered the seventh grade. The parties agreed that at that point: (1) a custody evaluator would assess whether a change in custody to R.B. (Father) remained in Child's best interest, (2) the "legal presumption" would be that a change in custody would be in Child's best interest unless the evaluator determined otherwise, and (3) custody would transfer to Father for Child's seventh, eighth, and ninth grade years if "the transfer of custody is determined to be in [Child's] best interest." When the time for the change of custody approached, Mother challenged the validity of the agreement. The district court found that the agreement was valid but conducted an evidentiary hearing to determine whether the custody switch would be in Child's best interest. At the hearing, the custody evaluator testified that the change of custody would be in Child's best interest. The district court disagreed and left custody with Mother. Father appeals. We affirm.

## BACKGROUND

¶ 2    This case is born of a contentious divorce. Father and Mother each sought custody of Child after they filed for divorce in 2006. This was, the district court observed, a "high conflict case":

> While many titles could be attributed to the case, it is and has evidently always been a high conflict case. Before the [divorce] decree, there were numerous hearings before the commissioner, objections to the recommendations of the commissioner, motions to reconsider the commissioner's orders, motions for contempt, discovery disputes, motions for discovery sanctions, motions to compel, motions for Rule 11 sanctions, accusatory affidavits, allegations of abuse and child abuse, numerous temporary orders, motions to transfer jurisdiction to Kentucky, requests for communication with the

Kentucky courts, disputes about a custody evaluation, a Rule 60(b) motion for relief from an order denying bifurcation, motions to disqualify counsel . . . , disputes about GAL fee allocation, motions to strike pleadings as untimely, a motion for [a temporary restraining order] . . . alleging [Mother] was trying to get [Father] dismissed from his job . . . , allegations by [Father] against the two female commissioners who have been assigned on this case of sexual discrimination against [Father], and changes of counsel.

¶ 3    On October 26, 2009, the parties attended a statutorily mandated mediation conference and reached a stipulated agreement on the issue of custody, which the then-assigned district court judge memorialized in the December 2009 divorce decree:

3. The parties are awarded joint legal custody of the minor child with the terms set forth in the Joint Legal Custody Parenting Plan annexed hereto as Exhibit A and incorporated as if set forth fully herein. [Mother] is awarded sole physical custody of the parties' minor child subject to [Father's] right to parent-time according to the Joint Legal Custody Parenting Plan. [Mother] shall retain physical custody of the minor child until he begins the seventh grade at which time custody will be transferred to [Father]. Prior to the change of custody, the following shall occur:
a. At the beginning of the minor child's sixth grade school year, the parties will retain Dr. Heather Walker to evaluate whether the change in custody is still in the best interest of the minor child. The legal presumption will be that the change of custody is in the child's best interest unless determined otherwise by Dr. Walker. If Dr. Walker is unavailable to perform the evaluation then the parties shall retain Dr. Val Hale or Dr. Denise

Goldsmith in that order. The cost for the evaluation shall be divided between the parties.

b. If the transfer of custody is determined to be in the child's best interest, physical custody will transfer to [Father] at the beginning of the minor child's seventh grade year for seventh, eighth and ninth grade. After the ninth grade, the minor child's input will be taken into consideration regarding the ongoing custody arrangements.

Mother and Father abided by the terms of the agreement for several years, during which time Child lived in Kentucky with Mother but visited Father in Utah.

¶ 4    The agreement required that the follow-up custody evaluation be performed in the summer of 2012. However, in February 2012, Mother moved for relief from the custody provisions pursuant to rule 60(b)(6) of the Utah Rules of Civil Procedure. *See Kallas v. Kallas*, 614 P.2d 641, 645 (Utah 1980) ("Trial courts have continuing jurisdiction to consider motions to modify dealing with child custody and visitation rights."). She alleged that the provisions were void as against public policy because they included an automatic transfer of custody. In the intervening years, the case had been reassigned to a second judge. The second judge ruled that the agreement's custody provisions were enforceable because the transfer of custody was not automatic. The second judge ordered that a custody evaluation be performed and that, once it was completed, the court would conduct "a further evidentiary hearing . . . in order for the Court to determine ultimately what is in the best interest of the minor child." The case was then reassigned to two other judges before a fifth judge, whose ruling is the subject of this appeal, was assigned to the case.

¶ 5    The fifth judge presided at a two-day evidentiary hearing on December 11, 2012, and December 19, 2012. The custody evaluator, Dr. Walker, opined that Child's best interest would be served by living with Father. The district court allowed two of Mother's witnesses to testify via videoconference. It then issued

a forty-page memorandum decision in which it concluded that Child's "best interests now lie in his stable situation, improving school [performance,] and friends, and where he has lived all but 10 months of his life." Accordingly, the district court allowed Mother to retain custody of Child.[2] Father appeals.

ANALYSIS[3]

I. Custody Provisions

A.    The District Court Did Not Rule That the Custody Agreement Was Void as Against Public Policy.

¶ 6    Father first asserts that the district court erroneously concluded that the custody agreement was contrary to public policy and therefore unenforceable. He concedes that parties to a contract are not bound by contractual terms that clearly violate public policy. *See Ockey v. Lehmer*, 2008 UT 37, ¶ 19, 189 P.3d 51 ("[C]ontracts that offend public policy or harm the public are void ab initio."); *see also id.* ¶ 21 ("For a contract to be void on the basis of public policy, there must be a showing free from doubt that the contract is against public policy." (citation and internal quotation marks omitted)). He argues, however, that the change-of-custody provisions were not clearly against public policy and

---

2. In the December 24, 2012 decision, the district court noted that, under the terms of the divorce decree, the parties could relitigate "ongoing custody arrangements" in 2015 and that "the case is now set up and on target for another lengthy, conflicted hearing in two and half years over where the child will live at that time." The court urged the parties to "work diligently to avoid putting the child through this [again] in two and a half years."

3. Father raises numerous issues on appeal; for clarity, we identify the appropriate standard of review for each issue in the section of our analysis addressing that issue.

that the district court therefore erred in ruling that the parties were not bound by them.

¶ 7    The district court did not, however, rule that the agreement was unenforceable. Nor did it find that the agreement violated public policy. Instead, it noted that the agreement *would* be contrary to public policy if it divested the court of its ability to perform its statutory duty of ensuring that the custody arrangement was in the best interest of the child. The court analyzed the agreement and described its provisions as "a bit ambiguous" because one subsection implied that the evaluator would merely give input to the court while another implied that the evaluator would make the best-interest determination.[4] The district court ultimately ruled that the agreement did not contemplate a "self-executing" custody change and that "it is a court determination, not the evaluator's determination, which must be made concerning best interests."

¶ 8    Father does not directly attack the court's interpretation of the agreement. Instead, Father asserts, "The court gave no legal effect to the parties' agreement to bind themselves to the evaluator's *professional* opinion . . . ." (Emphasis in original.) The flaw in his argument is that the district court interpreted the language "If the transfer of custody is determined to be in the child's best interest" to mean the parties intended the district court to make that determination based upon input the evaluator provided. Father does not explain how the district court misread the custody agreement, but instead characterizes the ruling as voiding the agreement on public policy grounds.[5] Because the

---

4. Neither party has argued that the agreement's language was ambiguous, nor did Father or Mother seek to introduce extrinsic evidence of the parties' intent.

5. Father does not argue that the district court failed to give appropriate    attention    to    the    agreement's    "legal

(continued...)

district court never ruled that the agreement was void as against public policy, Father's argument that such a ruling was error necessarily fails.

B.     Even If the Agreement Did Not Contemplate District Court Review, the District Court Retained the Authority to Make a Best-Interest Determination.

¶ 9     Even if we were to assume that the district court misread the agreement and inserted itself into the custody evaluation contrary to Mother and Father's intent, the district court did not err by ruling that it had the statutory authority to conduct a best-interest analysis. Whether the district court correctly applied a statute is a question of law; accordingly, we review the district court's interpretation for correctness. *See Estes v. Tibbs*, 1999 UT 52, ¶ 4, 979 P.2d 823.

¶ 10     Father asserts that the district court should have been "extremely reluctant to set aside prior judgments, even [one that was] stipulated," and that the court consequently should not have modified the 2009 change-of-custody provisions. Father concedes that "certain circumstances, especially given the court's continuing jurisdiction over custody, may warrant modification of a judgment" but asserts that the district court erred in intervening here. This raises the question of the extent to which parties can enter into custody agreements that purport to limit a district court's review.

¶ 11     Father's argument quotes extensively from this court's opinion in *In re adoption of E.H.*, 2004 UT App 419, 103 P.3d 177, which he asserts is the most analogous case. *But see In re E.H.*, 2006 UT 36, 137 P.3d 809 (rejecting the court of appeals' reasoning in that case and remanding it for further findings). That case involved a dispute between a birth mother and the

presumption . . . that the change of custody is in the child's best interest unless determined otherwise by Dr. Walker."

couple who adopted her child. *In re adoption of E.H.*, 2004 UT App 419, ¶¶ 2–9. After the birth mother lived with the adoptive parents, she came to believe that she had been misled about the adoptive family and developed serious misgivings about the adoption. The birth mother filed a petition to regain custody of her child; the adoptive parents filed a petition for adoption. Ultimately, the parties stipulated to a resolution of their dispute that provided for an evaluation by a clinical psychologist, who would determine questions of both custody and visitation. The parties agreed to be bound by the psychologist's recommendation, which the parties stipulated would be entered as a final judgment of the court without further proceedings. Based upon the stipulation, the district court entered an order memorializing its terms. *See id.*

¶ 12   The psychologist concluded that the child should be returned to the birth mother. The adoptive parents challenged the enforceability of their stipulation. The district court judge who had entered the original order had since retired, and the judge to whom the case had been reassigned voided the stipulation, concluding that the court "does not believe it is in the best interest of the baby to enforce the stipulation." *Id.* ¶¶ 9, 11 (internal quotation marks omitted).

¶ 13   This court overturned that decision and upheld the stipulation. *Id.* ¶ 32. We reasoned that "the stipulation of the parties waiving their respective claims and defenses and indicating they would be bound by the recommendations of the evaluator, and the court's approval of the arrangement, did restrict the usually unfettered prerogative of the court to ignore a mere recommendation." *Id.* ¶ 19. We also noted that the district court could have deviated from the recommendations if the psychologist had "conducted the evaluation in a manner that subverted the best interests of the child, departed from the best practices in custody and adoption studies and evaluations, deviated from counsel's specific requests, or otherwise varied from the provisions of the stipulation." *Id*. ¶ 19 n.8. Our holding could support the view that absent a showing of some irregularity in a recommendation's preparation, a district court

must enforce the parties' stipulated custody-determination procedure.

¶ 14    However, Father's reliance on our ruling in *In re adoption of E.H.* is severely, if not completely, undercut by the Utah Supreme Court's subsequent decision in the same matter.[6] *See In re E.H.*, 2006 UT 36. The supreme court affirmed our holding that the district court erred in setting the stipulation aside, but criticized our reasoning. Specifically, the supreme court stated that "[we do] not believe that [the district court] was obliged to summarily enforce [the stipulation,] and to this extent, we depart from the court of appeals' decision." *Id.* ¶ 19. The supreme court "agree[d] with the court of appeals' conclusion that the stipulation between the mother and the adoptive parents did not unconstitutionally strip the district court of core functions because the district court did not surrender to [the psychologist] its authority to enter a custody order." *Id.* ¶ 21. The supreme court determined that "the court merely agreed to follow a process for the determination of the best interests of E.H. and to uphold this process so long as it adequately served that end." *Id.* The supreme court further held that even when the parties in a custody dispute agree to be bound by an evaluator's findings, the district court retains "the ultimate authority to preside over the proceedings, to satisfy itself that [the evaluator's] recommendations were properly arrived at, and to enter a final order." *Id.* ¶ 28. The supreme court ultimately upheld the stipulation because the parties' arrangement "adequately served [the] end" of determining E.H.'s best interest and the district court had "satisf[ied] itself that [the psychologist's] recommendations were properly arrived at." *Id.* ¶¶ 21, 28.

¶ 15    Since the supreme court's decision in *In re E.H.*, this court has had another opportunity to consider the deference a district court owes to an automatic change-of-custody stipulation. *See*

---

6. Father's opening brief does not the existence of the supreme court's decision.

*Taylor v. Elison*, 2011 UT App 272, 263 P.3d 448. In *Taylor*, the district court was presented with dueling petitions for temporary modification of custody. *Id.* ¶ 4. The divorcing parents had agreed that if the mother, who was awarded initial custody, moved out of state, custody would transfer automatically to the father. *Id.* ¶¶ 2, 10. That agreement was memorialized in the divorce decree. *Id.* The district court enforced the change-of-custody provision without conducting a best-interest analysis, reasoning that the parties had contemplated the move and that therefore there had been no change in circumstances that would trigger its ability to conduct such an inquiry.[7] *Id.* ¶ 15. We reversed and remanded with instructions to the district court that it analyze whether the change in custody was in the childrens' best interests. We noted that the "district court's decision was . . . focused on the letter of the divorce decree rather than on the actual circumstances of the children's custodial arrangement" and that "[a]lthough perhaps technically correct in that it made no change in the provisions of the decree, the district court's decision resulted in a very real 'modification of custody' from the children's perspective." *Id.* ¶ 19.[8]

¶ 16    The instruction of the supreme court's holding in *In re E.H.* and our ruling in *Taylor* is that parties cannot stipulate away the district court's statutory responsibility to conduct a best-interest analysis. *See* Utah Code Ann. § 30-3-10(1)(a)

---

7. District courts must make two findings of fact before modifying a child custody order: first, there must have been a material change in the circumstances upon which the earlier order was based, and second, a change in custody must be in the best interest of the child. *Wright v. Wright*, 941 P.2d 646, 650 (Utah Ct. App. 1997).

8. Similarly, here, Father and Mother's stipulation contemplated a move from Kentucky to Utah that would result in a "very real modification" from Child's perspective.

(LexisNexis 2013) ("In determining any form of custody, including a change in custody, the court shall consider[, inter alia,] the best interests of the child . . . .").[9] Although parties may plan for contingencies and develop mechanisms to assess a child's best interest outside of the court system, our case law instructs that they cannot divest the district court of its statutory charge to ensure that any custody arrangement or change of custody serves the child's best interest.

¶ 17   Father poses the question, "Can parents resolve issues of child custody via the legal procedures established for doing so as Utah law demands, have that resolution reduced to judgment, and rely on the courts to enforce the judgment once entered?" We are sympathetic to Father's plea; in 2009, the stipulation must have seemed an elegant solution to an intractable problem. However, Utah law has recognized that in the context of a child's well-being, interests in finality rank below the child's welfare. *See Elmer v. Elmer*, 776 P.2d 599, 603 (Utah 1989) (stating that "the res judicata aspect of the rule [favoring finality of judgments] must always be subservient to the best interests of the child" and that "even when an initial decree has adjudicated the best interests of a child, a subsequent proceeding [can] reopen that decree . . . if the circumstances pertaining to the decree [have] subsequently changed, so that a new determination should be made based on a full development of all material facts"). The *Elmer* court noted that "'[t]he best interests of the child should never be lost sight of, and rules on change in custody should not be so rigid that this overarching principle is not followed.'" *Id.* at 604 (quoting *Kramer v. Kramer*, 738 P.2d 624, 629 (Utah 1987) (Howe, J., concurring in the result)). The same logic applies to judgments predicated on

---

9. This statute has not changed in a way material to our analysis since the district court's resolution of the issue. *See* Utah Code Ann. § 30-3-10(1)(a) (LexisNexis Supp. 2009) ("In determining any form of custody, the court shall consider[, inter alia,] the best interests of the child . . . .")

stipulated agreements. Despite Father's argument that the district court disturbed the parties' settled expectations, the district court retained the statutory authority to conduct the best-interest analysis. Because the district court was required to ensure that Child's best interest would be served by a change in custody, the district court did not err in conducting a best-interest analysis.[10]

---

10. Father notes that a best-interest determination had been made by one of the judges previously assigned to the case and argues that the district court could not have conducted a fresh best-interest analysis without violating law-of-the-case principles. Specifically, he argues that the first judge's 2009 incorporation of the agreement into the divorce decree was an implicit finding that the custody provisions of the agreement were in Child's best interest.

"While a case remains pending before the district court prior to any appeal, the parties are bound by the court's prior decision, but the court remains free to reconsider that decision." *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588. Thus, the law-of-the-case doctrine "*allows* a court to decline to revisit issues within the same case once the court has ruled on them." *Id.* ¶ 26 (emphasis added). Even if Father were correct that the district court's 2009 incorporation of the automatic change-of-custody provision into the decree of divorce was an implicit finding that the provision was in Child's best interest, that finding did not forever bind the district court. The district court therefore did not violate law-of-the-case principles when it revisited the issue. Despite Father's protests that "'one district court judge cannot overrule another district court judge of equal authority,'" (quoting *Mascaro v. Davis*, 741 P.2d 938, 946 (Utah 1987)), the law-of-the-case doctrine "does not prohibit a district court judge from revisiting a previously decided issue during the course of a case, regardless of whether the judge has changed or remained the same throughout the proceedings," *Mid-America Pipeline Co. v. Four-Four, Inc.*, 2009 UT 43, ¶ 11, 216 P.3d 352. This is because "two judges, while

(continued...)

II. Sufficiency of the Evidence and Adequacy of the Findings

¶ 18   Father next contends that the district court's findings were inadequate to justify its departure from the custody evaluator's recommendation. Although a district court is not bound to accept a custody evaluator's recommendation, the court is expected to articulate some reason for rejecting that recommendation. *Woodward v. LaFranca*, 2013 UT App 147, ¶ 7, 305 P.3d 181; *see also Tuckey v. Tuckey*, 649 P.2d 88, 91 (Utah 1982) (remanding for additional findings because the trial court rejected a recommendation without explanation); *Sukin v. Sukin*, 842 P.2d 922, 925–26 (Utah Ct. App. 1992) (same).

¶ 19   Here, the district court considered the evaluator's findings and recommendations but declined to adopt them. In its ruling, the district court explained its understanding of how Dr. Walker, the evaluator, had arrived at her findings and the basis of her recommendation that Father be granted custody. The district court noted that Dr. Walker, who had also evaluated Child during the 2009 proceedings, had performed a follow-up evaluation of Child rather than a full evaluation, which would have included Mother and Father. The district court stated that other testimony contradicted Dr. Walker's findings. The district court found that "the child, contrary to the opinion of Dr. Walker, is . . . happy and well adjusted." The district court concluded that, despite its great respect for Dr. Walker's work, the other testimony before the district court led it to disagree with her recommendation. *See Woodward*, 2013 UT App 147, ¶ 19 n.4 ("[A] trial court is free to . . . weigh the [e]valuator's recommendations in the context of all the other evidence before the court."). On this record, we cannot conclude that the district

different persons, constitute a single judicial office." *In re R.B.F.S.*, 2012 UT App 132, ¶ 12, 278 P.3d 143 (citation and internal quotation marks omitted). Accordingly, the district court was not bound by previous decisions made by the other judges who had presided during the course of the litigation.

court failed to articulate its reasons for departing from Dr. Walker's recommendation.

¶ 20   Father also asserts that "certain of the court's findings, and the evidence as a whole, are unsupported and insufficient to undermine the expert's opinion." Specifically, he challenges the district court's findings relating to Child's weight gain, misbehavior, and academic performance.

A.    Father Did Not Preserve a Challenge to the Adequacy of the District Court's Findings.

¶ 21   Father first argues that the district court "refused to blame . . . Mother for" Child's unhealthy weight gain. He points to the evaluator's testimony that Child's weight gain was "absolutely more pronounced" after Child began residing with Mother under the agreement. However, the district court's findings did not seek to assign blame; rather the district court focused on whether Child's weight gain was being addressed.[11] We therefore read Father's claim that the district court should have entered a finding blaming Mother as a challenge to the adequacy of the findings rather than the sufficiency of the evidence. "A challenge to the adequacy of the court's findings is notably different from a challenge to the sufficiency of evidence." *In re K.F.*, 2009 UT 4, ¶ 61, 201 P.3d 985. A party waives any argument regarding the adequacy of findings by failing to raise the claim before the district court. *Id.* ¶¶ 61–64.

---

11. The district court found that Child was "probably at an unhealthy weight right now" but concluded that "such is no doubt the result of many factors, not just [M]other." The district court then noted that Mother had enrolled Child in a martial arts course, acknowledging Father's criticism that this course was simply "window dressing for the court." The court also recounted evidence that Mother's other son, a personal trainer, was assisting Child with an exercise regimen. And the court recognized that Child's weight gain had slowed.

¶ 22    After the court entered its findings, Father moved to alter or amend those findings pursuant to rule 59 of the Utah Rules of Civil Procedure. That motion, however, did not request a finding of blame or explain why a finding of blame for Child's past weight gain was necessary to determine Child's future best interest. Father therefore waived this argument, and we do not address it further.[12]

¶ 23    Similarly, Father expresses surprise that "the court did not address the evaluator's significant testimony concerning Mother's acts of parental alienation." He complains that "[d]espite this important testimony, the court concluded only that Mother and Mother's family were not supportive of the child coming to Utah, a conclusion far less significant [than] the evaluator's actual testimony." In essence, Father objects to the absence of a finding that Mother "had engaged in parental alienation." Father did not preserve this issue in his rule 59 motion and has therefore waived it. Because it is not properly before us, we do not address it further.

B. Father Fails To Demonstrate That the District Court's Findings on Child's Misbehavior and Academic Performance Were Unsupported by Sufficient Evidence.

¶ 24    Father next argues that insufficient evidence supported the district court's findings concerning Child's misbehavior and academic performance. "A challenge to the sufficiency of the evidence concerns the trial court's findings of fact. Those findings will not be disturbed unless they are clearly erroneous." *Cummings v. Cummings*, 821 P.2d 472, 476 (Utah Ct. App. 1991). "The trial court's factual determinations are clearly erroneous

---

12. Father notes that "the court's finding that [Child was] overweight certainly cannot support the conclusion that his custody with Mother promotes his best interest." However, the court's finding that Mother's efforts had in fact succeeded in slowing Child's weight gain did support that conclusion.

only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Id.* (citation and internal quotation marks omitted).

1.    Child's Misbehavior

¶ 25    Father asserts that the district court erred by finding that the stress of the divorce caused Child's misbehavior. Father argues that the stress of the divorce process could not have caused Child's misbehavior because that misbehavior "only arose . . . when the parties were at peace" after the decree of divorce. But the district court's finding was that the behavioral problems "cannot be placed solely at the feet of [M]other" because Child "was impacted by the decision of both parties to divorce and change forever . . . the family makeup." Thus, the court's actual conclusion was that the fact of the divorce, not the process of the divorce, caused Child's misbehavior. Father also asserts, with his own capitalization, that "the court hypothesized on evidence NOT in the record as causing these problems but ignored the unbiased evidence that was presented."[13] Father points to the evaluator's testimony to the effect that Mother was depressed, had low energy, and was easily overwhelmed. According to Father, the evaluator also testified that children cared for by parents with these types of issues are more prone to acting out.

¶ 26    We reiterate the long-standing observation that a fact-finding district court is best positioned to evaluate the credibility of a witness. *See In re Z.D.*, 2006 UT 54, ¶ 24, 147 P.3d 401 ("The

---

13. This claim may plausibly be read as a complaint that no evidence before the district court suggested that children remain stressed by a divorce decree even after the conclusion of the divorce process. However, Father's brief does not develop an argument based on that reading, and we therefore do not address it further.

doctrine that shapes and guides judicial review is that it is not within the province of an appellate court to substitute its judgment for that of a front line fact-finder except when exceptional circumstances warrant more rigorous scrutiny."). We will therefore overturn a district court's resulting findings of fact only when "they are clearly erroneous." *Cummings*, 821 P.2d at 476. An appellant challenging a finding of fact bears the heavy burden of demonstrating that the finding is clearly erroneous and must do so by showing that the finding is without adequate evidentiary support or was induced by an erroneous view of the law. *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 9, 288 P.3d 1046. As a practical matter, this will generally entail marshaling all of the evidence that could have supported the finding, because an appellate court cannot determine whether the evidence supporting a finding was insufficient without first knowing what that evidence was. *See Bailey v. Retirement Bd.*, 2012 UT App 365, ¶ 8, 294 P.3d 577 (noting that "an argument that does not fully acknowledge the evidence supporting a finding of fact has little chance, as a matter of logic, of demonstrating that the finding lacked adequate factual support."); *see also State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645 ("[A] party challenging a factual finding or sufficiency of the evidence to support a verdict will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal.").

¶ 27    Here, Father recounts the evaluator's opinion of Mother's psychological health. But he fails to mention that the evaluator was describing the results of the 2009 evaluation and that the evaluator's 2012 follow-up did not reveal the continued presence of those conditions. He also fails to mention that the evaluator admitted that she had not talked to Mother's psychiatrist. And he further fails to mention that the evaluator testified that "divorce . . . is really traumatic for children." The district court noted that the divorce, and the resulting custody arrangement, "alone is a major stressor in this child's life and alone, apart from any parenting ability, can impact schoolwork, emotional behavior, acting out, and eating and social habits." The court also found that Child's inappropriate school behaviors "were more frequent in the past than they have been in more recent

years." As a result of these failures, Father's insufficiency of the evidence claim assails a straw man. He argues in effect that a selected portion of the evidence supporting the court's findings provided inadequate support without addressing the additional supporting evidence. Father has therefore failed to shoulder his burden of establishing that the district court's findings concerning Child's misbehavior lacked the support of substantial evidence. *Cf. State v. Mitchell*, 2013 UT App 289, ¶ 31, 318 P.3d 238 ("An appellant cannot demonstrate that the evidence supporting a factual finding falls short without giving a candid account of that evidence.").

2.      Child's Academic Performance

¶ 28    Father next asserts that insufficient evidence supported the district court's findings regarding Child's academic performance. The district court recognized that Child's "schooling is probably not described best as 'thriving' but . . . is certainly adequate." Father asserts that the court "dismiss[ed] the child's academic struggles by explaining that average is good enough" and argues, "Nothing could be further from the truth." Father suggests that the evidence did not support a finding that Child's academic performance was "even average or adequate." He points to Child's standardized test results, which he describes as showing that Child's scores were below average.

¶ 29    Father's argument conflates the terms "average" and "adequate." In this context, the "average" is a mathematically calculable number and is thus an objective measure. In contrast, "adequate" is a subjective term. To assess the question of whether a student's academic performance is adequate, a district court does not abuse its discretion by looking beyond the student's standardized test scores.

¶ 30    The district court made numerous observations in support of its finding of adequacy. It noted that "[i]n sixth grade the child had mostly Ds and Fs. This year he has mostly As and Bs and one C in the first trimester." The district court also took into account that Child "participates in a school program

designed to help students get their work done" and recognized that Child's school was "rated in the top 15% of private schools in the nation." The court wrote that "[p]erhaps all parents wish to live in a Lake Wobegon/Garrison Keillor-esque world where all the children are above average, but on the whole most of us are quite average" and concluded that Child's "schooling is probably not described best as 'thriving' but he is certainly adequate."[14] Even if we were to agree with Father that the evidence proves that Child's standardized test scores are *objectively* below average,[15] it would not logically follow that the district court's finding—that Child's overall schooling was *subjectively* adequate—lacked substantial evidentiary support.

---

14. The *News from Lake Wobegon* is a feature of the American Public Media radio show *A Prairie Home Companion*, hosted by Garrison Keillor. The closing words of each news broadcast segment are "Well, that's the news from Lake Wobegon, where all the women are strong, all the men are good looking, and all the children are above average." *See* A Prairie Home Companion, http://www.prairiehome.org/listen/podcast/ (last visited Oct. 30, 2014).

15. In the argument section of his brief, Father claims that "[t]he unrefuted evidence was that child was below average in all grades, in all areas, on all tests, with percentile scores of 19, 21, 22, 25, 26, 29, 31, 32, 38, 39, and 46." However, these numbers appear to be the lower bounds of the standard deviations rather than Child's actual scores. Moreover, Father's argument in this regard omits an above-average percentile score of 61, which he previously mentioned in his own fact section under the heading "Facts Established at Trial and the Court's Findings that Father Does Not Dispute." And our examination of the score report Father cites reveals that Child achieved other above-average percentile scores of 52, 53 (twice), 55, 63 (twice), 64, 72 (twice), 77, and 82.

¶ 31 Father also challenges testimony offered by the principal of Child's school relating to this issue. He notes that because the school was private and had no waiting list, the principal had a financial stake in having Child remain a student at the school. Father does not develop this argument further or explain why this observation matters. *See* Utah R. App. P. 24(a)(9). Father also elicited principal's testimony as to how much the school charged each student. It may be that Father intends to suggest that the district court erred by crediting the principal's testimony despite the suggested financial interest in Child's continued attendance. However, because the district court is "in the best position to assess the credibility of witnesses," *State v. Maestas*, 2012 UT 46, ¶ 193, 299 P.3d 892 (citation and internal quotation marks omitted), we defer to a district court's witness-credibility determination unless it is "in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made," *see Cummings v. Cummings*, 821 P.2d 472, 476 (Utah Ct. App. 1991) (citation and internal quotation marks omitted). *See also* Utah R. Civ. P. 52(a) ("Findings of fact [made by a trial court] shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). Here, the evidence Father now cites to show lack of credibility was before the district court when it implicitly deemed the principal's testimony credible. Because Father has not shown that the principal's testimony was against the clear weight of the evidence, we will not second-guess the district court's determination. *See In re Z.D.*, 2006 UT 54, ¶ 24, 147 P.3d 401.

¶ 32 For these reasons, we reject Father's challenge to the sufficiency of the evidence supporting the district court's finding that Child's schooling was adequate.

¶ 33 Father has not demonstrated clear error in the district court's decision to depart from the evaluator's recommendation. *Cummings*, 821 P.2d at 476.

III. Witnesses

¶ 34   Father contends that the district court erred "to the substantial prejudice of Father in allowing witnesses to testify who were never disclosed as witnesses in either Mother's answers to interrogatories or pretrial disclosures." Specifically, he objects to the admission of testimony by the principal and the guidance counselor at Child's school.

¶ 35   "If a party fails to disclose a witness . . . that party shall not be permitted to use the witness . . . unless the failure to disclose is harmless or the party shows good cause for the failure to disclose." Utah R. Civ. P. 37(h); *see also* Utah R. Civ. P. 26(d)(4). The district court has the discretion to determine whether good cause excuses the nondisclosure and whether allowing the undisclosed witness to testify at trial would be harmless. *See Spafford v. Granite Credit Union*, 2011 UT App 401, ¶ 16, 266 P.3d 866. "We will not disturb the trial court's rulings regarding the admissibility of evidence unless it clearly appears that the lower court was in error," and that the error affects a party's substantial rights. *Belden v. Dalbo, Inc.*, 752 P.2d 1317, 1319 (Utah Ct. App. 1988). To establish that a substantial right of a party is affected, there must be a reasonable likelihood that, absent the error, a different result would have been reached at trial. *Id.* An appellate court may "affirm the trial court's decision to admit evidence on any proper grounds, even though the trial court assigned another reason for its ruling." *State v. Gray*, 717 P.2d 1313, 1316 (Utah 1986).

¶ 36   Mother did not identify the principal or guidance counselor as witnesses in her pretrial disclosures or answers to interrogatories. On the day the district court had set for the disclosure of witnesses, less than two weeks before the hearing, Mother filed a motion to transfer the matter to Kentucky. In support of that motion, Mother attached the affidavits of more than twenty potential witnesses who stated that they would be willing to testify if the hearing were conducted in Kentucky. The principal's and guidance counselor's affidavits were among

those submitted in support of the motion, but Mother did not identify them as witnesses as the court had ordered.

¶ 37   The court denied Mother's motion to transfer but allowed Mother's witnesses to testify via videoconference. After the first day of the hearing, Father moved to exclude those witnesses because they had not been properly disclosed. The court denied Father's motion, stating that "what [the witnesses] say about [Mother], presumably about her parenting ability[,] is still important in the best interest [determination] and so I'll hear those folks."

¶ 38   Mother argues that her failure to disclose the identities of the witnesses was harmless because Father "did not seek to depose any other witnesses" besides Mother and thus Father only "lost a right [it appears] he never intended to exercise." But we cannot guess what Father may have done had the identities been properly disclosed. Our rules of civil procedure require the disclosure of all witnesses, not merely those that the disclosing party believes the other side may want to depose. And the disclosure of potential witnesses serves purposes beyond facilitating depositions.

¶ 39   Nevertheless, Father bears two burdens on appeal: first, to demonstrate that the district court erred by admitting the testimony of the principal and the guidance counselor, and second, to show that "there is a reasonable likelihood that a different result would have been reached" absent the error. *Belden*, 752 P.2d at 1319 (citation and internal quotation marks omitted). Even if we were to agree with Father as to the first point, he makes no effort to prove the second.

¶ 40   Father does not claim that the result of the hearing would have differed had the district court excluded the testimony or continued the hearing to allow Father to take depositions. Nor does Father argue that the content of the testimony resulted in

unfair surprise. Indeed, he concedes that affidavits from the principal and the guidance counselor were attached to Mother's motion.[16] Father does not claim that the testimony was harmful to his case and does not identify any additional information that he would have introduced to rebut the testimony. *Cf. Salt Lake City v. Almansor*, 2014 UT App 88, ¶ 11, 325 P.3d 847 (rejecting a plain error claim regarding a trial court's failure to procure a witness, because the defendant did not "address the anticipated content of the witness's testimony at all" and did not "demonstrate how her testimony would have helped the defense"). And Father does not explain whether the content of the witnesses' testimony was corroborated by other evidence. In essence, he asks us to assume that allowing the testimony changed the result of the hearing. We decline to do so, and we therefore conclude that Father has not carried his burden of demonstrating a reasonable likelihood of a different result.

### IV. Timeliness of Mother's Rule 60(b)(6) Motion

¶ 41    Father next contends that the district court erred "by allowing Mother to challenge the validity of the judgment over two years after its entry" via a motion brought under rule 60(b)(6) of the Utah Rules of Civil Procedure. Mother responds that her motion was timely because the contested custody provision did not take effect until August 2012. The district court ruled that Mother's motion was, "under the circumstances, timely and brought within a reasonable time as to a future event as there would have been no trigger to cause the parties to consider the provision in question."

---

16. We are sympathetic to Father's complaint that Mother's "gamesmanship" in identifying more than twenty potential witnesses shortly before the hearing forced him to "decipher from tea leaves whom among many she would call." But this complaint does not suggest that the hearing would have reached a different outcome had the court prevented the witnesses from testifying.

¶ 42   Rule 60(b) allows a court to "relieve a party . . . from a final judgment, order, or proceeding" upon a motion made within a reasonable time and demonstrating one of several enumerated conditions. The final listed condition justifying relief is "any other reason justifying relief from the operation of the judgment." Utah R. Civ. P. 60(b)(6). A district court's decision on a rule 60(b) motion is generally reviewed for an abuse of discretion. *Lange v. Eby*, 2006 UT App 118, ¶ 6, 133 P.3d 451 (explaining that because a district court has discretion in determining whether a movant has shown rule 60(b) grounds, we will generally only reverse that ruling when there has been an abuse of discretion). However, when the ruling is "predicated on the district court's interpretation of the law, we review that decision for correctness." *Kell v. State*, 2012 UT 25, ¶ 7, 285 P.3d 1133. "The remedies provided by rule 60(b) should not be understood to be a substitute for appeal." *Id.* ¶ 18 (citation and internal quotation marks omitted). And rule 60(b)(6) in particular should be invoked with great caution and only in unusual and exceptional circumstances. *Id.*

¶ 43   Even if we were to agree with Father that a rule 60(b) motion was untimely, the district court did not rely on rule 60(b) as the procedural mechanism to address the dispute. Father filed a motion to enforce the judgment and decree, and it is that motion that the court used as an invitation to conduct its best-interest review. The district court's amended decree of divorce noted that this "matter came before the Court on a motion from [Father, asking] that the Court enforce the provisions of its original Decree." In its memorandum decision, the district court struggled to characterize the nature of the proceeding:

> This proceeding is not easily categorized as most post-decree cases are. It is not a modification nor is it strictly an enforcement action . . . . It is an evidentiary hearing to determine the best interests of the child, to determine if the agreed upon decree should be enforced and maintained or whether the best interests of the child require some other

custody arrangement than that contemplated by the parties.

There is no indication in the record that the court relied upon rule 60(b)(6) as the basis for the actions it took. Nor is there any question that the district court possessed the authority to conduct a best-interest review. *See supra* ¶¶ 15–16. Accordingly, Father's argument that Mother's rule 60(b) motion was tardy does not cast doubt upon the propriety of the district court's actions.

## V. Consideration

¶ 44   Father contends that the district court erred by denying his "request to have the additional consideration paid by him to Mother in exchange for her assent to the custody plan returned to him in light of Mother's successful destruction of the stipulation." He asserts that, in exchange for her stipulation to the custody provisions, he "gave Mother a greater portion of the marital estate as well as forgave the $1,500.00 court-imposed fine for her prior contempt and discovery abuses." He also claims that his concessions totaled $8,848.11.

¶ 45   An issue presented on appeal must be adequately briefed. *See* Utah R. App. P. 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented . . . with citation to the authorities, statutes, and parts of the record relied on."). The gist of Father's claim is that "equity demands that Mother refund the additional consideration paid to her by Father . . . in exchange for Mother's empty promises." Father cites no case or statute in support of this statement. Nor does he offer any legal support for his assertion that the district court erred by denying his request. Father has therefore failed to carry his burden on appeal of demonstrating error. *See State v. Robison*, 2006 UT 65, ¶ 21, 147 P.3d 448 (noting that the appellant bears the burden of persuasion on appeal and that an appellate court will not "do the heavy lifting" for the appellant). For this reason, we decline to reverse the district court's ruling.

CONCLUSION

¶ 46   The district court did not err in interpreting the parties' agreement as allowing the court to assess Child's best interest. Even if it misread the agreement, the district court retained the authority to determine Child's best interest and thus did not err by conducting a best-interest analysis. Nor did the court err by weighing evidence and eventually rejecting the evaluator's recommendation.

¶ 47   Father did not preserve his claims that the court's findings were inadequate. With regard to the sufficiency of the evidence to support the findings, Father has not carried his burden on appeal. Specifically, he fails to note and counter significant evidence that supported the district court's findings.

¶ 48   Father alleges that the court erred by admitting testimony by the principal and the guidance counselor. But he does not show or even claim that the hearing would have reached a different result absent the alleged errors. Similarly, while he alleges that the court erred by ruling that Mother timely filed her motion for relief from judgment, he has not shown that a contrary ruling would have prevented the court from conducting a hearing to determine Child's best interest. Father also fails to carry his burden of persuasion on appeal on his claim for the return of additional consideration he asserts he provided to Mother in exchange for the stipulated custody agreement.

¶ 49   Affirmed.

_____